**In the Matter of the Complaint of BAY RUNNER RENTALS, INC. Owner of a Certain Tiger Shark Jet Ski Serial No. ARJ01063J495 for Exoneration from or Limitation of Liability.**

**No. CIV.A. WMN972399.**

United States District Court,
D. Maryland.

Sept. 14, 2000.

---

Robert L. Ferguson, Jr., Ferguson, Schetelich Heffernan, P.A., Baltimore, MD, for Bay Runner Rentals, Inc.

G. Macy Nelson, Baltimore, MD, for Samantha Kempton, Joan Goldberg.

Jervis S. Finney, H. Allen Black, III, Ober, Kaler, Grimes & Shriver, Baltimore, MD, Scott G. Olds, Grangeville, ID, for Arctic Cat, ABC Corporations 1–8.

### MEMORANDUM OPINION AND ORDER

BREDAR, United States Magistrate Judge.

This case concerns an accident in Ocean City, Maryland, in which a personal watercraft (PWC) collided with a bulkhead. The owner of the PWC, Bay Runner Rentals, Inc. (Bay Runner), seeks exoneration from or limitation of any liability it may have in relation to the accident, pursuant to the Shipowners' Limitation of Liability Act of 1851, 46 U.S.C.A.App. §§ 181–196 (1958) (the Act). The principal parties against whom Bay Runner seeks protection under the Act are Samantha Kempton, a passenger on the PWC; Joan Sarif Goldberg, Ms. Kempton's mother; and Arctic Cat, Inc. (Arctic Cat), the manufacturer of the PWC. On the day of the accident, the PWC was being operated by Steven Goldberg, the then-fiancé of Ms. Goldberg. While operating the PWC, Mr. Goldberg allegedly attempted to steer clear of the bulkhead but was unable to avoid colliding with it. In a three-day bench trial, the parties addressed two limited issues: 1) whether any negligent conduct by Bay Runner was a cause of the accident and 2) whether Bay Runner's

managerial employees had knowledge of the events or were in privity with the negligence. In this memorandum opinion and order, the Court holds that Bay Runner's conduct was negligent, that its negligence was a proximate cause of the accident, and that Bay Runner's managerial employees were in privity with these negligent acts. Therefore, Bay Runner fails in its effort to gain exoneration or limitation of liability under the Act.

## I. Procedural History

The history of this litigation begins with a separate, underlying tort suit filed in the United States District Court for the District of New Jersey by Ms. Kempton and Ms. Goldberg, (collectively the Claimants). *Kempton, et al. v. Bay Runner Rentals, Inc., et al.,* Civil Action No. MLP–96–5973 (Paper No. 1). The Claimants named Bay Runner and Arctic Cat as defendants and alleged, among other things, that Bay Runner failed to instruct Mr. Goldberg adequately about the handling characteristics of the PWC and specifically that when the throttle is disengaged, the PWC cannot be steered. *Id.* On July 11, 1997, the separate, underlying tort suit was transferred to this Court. *Kempton, et al. v. Bay Runner Rentals, et al.,* WMN–97–2350 (Paper No. 1).

On July 24, 1997, Bay Runner initiated the instant action seeking exoneration from or limitation of liability pursuant to the Act and Supplemental Admiralty Rule F of the Federal Rules of Civil Procedure. *Id.* In the instant action, Bay Runner alleges that it did adequately warn Mr. Goldberg; that it was not negligent in any way; and even if it were, any negligent act or omission was committed by a ministerial employee and without the knowledge of Bay Runner's managers, thus securing Bay Runner's exoneration from or limitation of liability. *Id.* The underlying tort action was then stayed pending the outcome of this action (Paper No. 5).

On August 29, 1997, Claimants filed a counterclaim against Bay Runner and a third-party complaint against Arctic Cat in the present Limitation of Liability Act case, making allegations that essentially mirrored those made in their complaint in the underlying tort suit (Paper No. 8). The same day, Arctic Cat filed a claim against Bay Runner, a third-party complaint against Steven Goldberg, and a cross-claim against Joan Goldberg seeking indemnity and/or contribution for any judgment that might be entered against Arctic Cat in the underlying tort suit (Paper Nos. 11, 12). On March 23, 1998, Bay Runner filed a third-party complaint against Steven Goldberg and a counterclaim against Joan Goldberg also seeking indemnity and/or contribution (Paper No. 40). Bay Runner and Arctic Cat have obtained entries of default against both Steven Goldberg and Joan Goldberg (Paper Nos. 65, 67, 84).

On September 30, 1999, this case was referred to the undersigned by the consent of all parties for all further proceedings and entry of judgment (Paper No. 90). On November 24, 1999, the Court exercised its discretion under Rule 42(a) of the Federal Rules of Civil Procedure and ordered a separate trial for the limited purpose of resolving only Bay Runner's Limitation of Liability Act claims (Paper No. 99). In this separate trial, the Court directed the parties to address: 1) what acts of negligence caused the accident and 2) whether the shipowner had knowledge of the events that caused the accident. *Id. See also* 46 U.S.C.A.App. § 183(a) (1958); *Empresa Lineas Maritimas Argentinas, S.A. v. United States,* 730 F.2d 153, 155 (4th Cir. 1984). The Court deferred ruling on a number of questions raised by the parties, including whether it could and should exercise jurisdiction over Claimants' cross-claim and counterclaim and whether Claimants waived their jury trial right when they brought their claims before this court of equity (Paper No. 99). On August 18, 2000, the Court completed the three-day separate trial on the issues identified in its November 24, 1999 order.

## II. Limitation of Liability Act

■ Congress enacted the Shipowners' Limitation of Liability Act of 1851 to promote investment in the domestic commercial shipping industry. The Act permits a vessel owner under certain circumstances to limit its liability to the value of the vessel after an accident. 46 U.S.C.A.App. § 183(a) (1958). Specifically, Section 183(a) provides that

> [t]he liability of the owner of any vessel ... for any ... loss ... without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

*Id.* The Circuit Courts have uniformly held that the Limitation of Liability Act applies not only to commercial vessels, but also to pleasure craft, including PWCs. *See Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745, 749 (4th Cir.1975); *Waggoner v. Nags Head Water Sports, Inc.*, 141 F.3d 1162, 1998 WL 163811 (4th Cir.1998) (per curiam) (noting that maritime law applies to jet skis). While extension of the Act to PWCs may appear to be inconsistent with the historical purposes of the Act, the Cir-

cuit Courts have appropriately resisted the urge to judicially legislate. Any restriction of the Act's applicability would require congressional action. *See, e.g., In re Keys Jet Ski, Inc.*, 893 F.2d 1225, 1228–29 (11th Cir.1990), *Endsley v. Young*, 872 F.2d 176, 178 (6th Cir.1989) ("If, indeed, anything is broken, it is up to Congress to fix it.").

■ The Fourth Circuit has adopted a two-step process for determining whether a shipowner may limit liability under Section 183(a): "First, the Court must consider what acts of negligence or conditions of unseaworthiness caused the accident.... [T]he second question [is] whether the shipowner had knowledge of the events which caused the loss." *Empresa*, 730 F.2d at 155. "The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the vessel's owner must prove lack of knowledge or privity to the negligence." *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1203 (6th Cir.1995).

## III. Findings of Fact [1]

Many of the "facts" in this case are in sharp dispute. The Court finds by a pre-

---

1. The Court's findings of fact are based on the exhibits entered into evidence and the testimony given at trial. The following is a brief summary of the witnesses called by the parties and the general subject of their testimony:

   **Mark and Susan Wenzlaff**, the president and vice president of Bay Runner, respectively, testified regarding the company's procedure for instructing its customers on the safe operation of the PWCs it rents. They described the training given to "counter girls" and "dock boys" and explained their responsibilities. In addition, Mr. Wenzlaff testified about his recollections of the day of the accident.

   **Dr. Gerald Goldhaber**, a professor of Communications at the University of Buffalo, testified as an expert in warnings, communication, and skill development. Based on his review of selected depositions and exhibits, Dr. Goldhaber opined that Bay Runner management provided adequate safety information to its employees and that Bay Runner's employees had adequately relayed safety information to Bay Runner's customers.

   **Corporal Glenn Lay** of the Maryland Natural Resources Police related the substance of his interview with Mr. Goldberg at the hospital immediately after the accident. Based on this interview and another officer's investigation of the accident scene and the damage to the PWC, Corporal Lay attributed the accident to two causes: 1) excessive speed and 2) failure to keep a proper lookout. Corporal Lay opined that the fact that a PWC cannot be steered when the throttle is closed was a contributing factor in this accident. Corporal Lay also testified that if Mr. Goldberg had been traveling at 6 knots, this accident would not have happened.

   **Jason Dare** worked for Bay Runner as a "dock boy" when this accident occurred. Mr. Dare described the training he received at Bay Runner and his responsibilities as a dock boy. He testified as to what information he provided to Bay Runner customers who rented PWCs.

   **Thomas Ebro**, a consultant with general experience and knowledge in the field of water safety, testified as an expert about general water safety principles. Mr. Ebro essentially pre-

ponderance of the evidence, taking into account respective burdens of proof, that the following is true:

Bay Runner has been a PWC livery operator since 1987. In 1995, Bay Runner owned approximately eight Tigershark PWCs manufactured by Arctic Cat. With each PWC, Arctic Cat supplied to Bay Runner a 44–page 1995 Tigershark Watercraft Operator's Manual (Arctic Cat Exhibit 2). PWCs lack steering capacity when the throttle is closed or "off." The operator's manual addressed this lack of off-throttle steering in three different sections (Arctic Cat Exhibit 2, pages 6, 15, 23). The manual states: **"Completely releasing the throttle control lever returns the engine to idle and eliminates all steering capabilities. WARNING: If the engine is not running or the throttle control lever is released, steering is impossible."** *Id.* at 15 (emphasis in original). Arctic Cat also provided Bay Runner with a seven-minute video entitled "Play It Safe" that among other things demonstrated the lack of steering capabilities when the throttle control lever was released (Claimants' Exhibit 3). Finally, affixed to the stern of each PWC was a label displaying nine warnings and cautions, all of which were 1″ × 2″ or less (Arctic Cat Exhibit 3). One of these warnings stated: "This watercraft has certain operating limitations. It does not have brakes and does not steer without applying the throttle. This is especially dangerous for inexperienced operators. Always operate within your and your craft's capabilities." *Id.*

Mrs. Wenzlaff, the vice-president of Bay Runner, developed Bay Runner's program for providing its customers with instruction regarding the safe operation of its PWCs. In 1995, Mrs. Wenzlaff was not a licensed boat operator and had less than five hours experience operating a PWC. She did not, however, personally instruct the customers. Instead, she relied on written information provided to the customers and oral communications from two groups of employees who were required to relay safety information to the customer.

Bay Runner elected not to show the Arctic Cat "Play It Safe" video to its rental customers. Bay Runner did provide its customers with two pieces of written material. First, each customer signed a rental agreement stating, *inter alia*, that "I have received operating instructions. I understand there are no brakes on a water vehicle and stopping distance from full speed is approximately 260 ft. Furthermore, I have read and understand Maryland rules and regulations regarding personal watercraft operation." (Bay Runner Exhibit 3). Although the text of the rental agreement was small, it was clearly legible. The agreement made no reference to the PWC's steering characteristics or limitations.

Bay Runner also provided its customers with the Maryland Department of Natural Resources (DNR) regulations relating to PWC operation. These regulations appeared on the back of the rental agreement and were also displayed on a 7″ × 11″ poster mounted on the wall of the rental office and on a plywood board at the dock. The regulations advised readers that a person may not operate a PWC in excess of 6 knots within 100 feet of any shore, wharf, pier, or piling. Like the agreement, the regulations made no reference to the PWC's steering characteristics or limitations.

Mrs. Wenzlaff testified that Bay Runner also placed selected pages from the Tigers-

opined that when renting water products, a livery must convey to its customers safety information supplied by the manufacturer related to serious injury or anything that is counter-intuitive.

**Joan Sarif Goldberg, Kimberly Kempton, Samantha Kempton,** and **Steven Goldberg** all testified about their recollections of the events that took place on the day of the accident. In addition, Mr. Goldberg testified about his previous experience riding a PWC in Aruba.

**Arctic Cat's Corporate Representative** described safety information provided by Arctic Cat to Bay Runner.

hark operator's manual on the rental counter under a plexiglass cover. No photograph of the rental counter was entered into evidence, and no witness identified exactly which pages were supposedly placed on the counter or what other information accompanied these pages on the counter (e.g., pages from operator's manuals for other rental equipment). Furthermore, in all probability, these pages would regularly have been obscured by rental agreements or other papers and objects resting on the rental counter. The Court therefore finds that Bay Runner failed to provide any part of the operator's manual to its customers unless they specifically asked to see it.

The first group of employees upon whom Bay Runner relied to relay safety information was the "counter girls" [2] who worked in the rental office. The counter girls were trained to greet customers and ask them to read and sign the rental agreement and DNR regulations. Mrs. Wenzlaff testified that she also trained the counter girls to instruct customers on the safe operation of the PWCs. This testimony, however, was not especially credible. Differing with his wife, Mr. Wenzlaff testified that the counter girls were primarily responsible for greeting the customers and providing rental agreements. The Court also notes that no counter girl testified at trial regarding the safety information Mrs. Wenzlaff alleges they routinely provided to Bay Runner's customers.

The second group of employees upon whom Bay Runner relied to provide its customers with safety information was the "dock boys" who ranged in age from sixteen to twenty-two years old. The dock boys met the customers when they left the rental office and walked down to the dock. Bay Runner required its dock boys to take an eight-hour boating safety course with instructors from the Coast Guard and a one-day PWC training course with instructors from the Maryland Department of Natural Resources. By taking the DNR course and passing a test, the dock boys were certified as PWC "guides."

New Bay Runner dock boys were trained primarily by more experienced dock boys with some input from Mr. and Mrs. Wenzlaff. They were told to point out and quickly review the posted DNR regulations and the warning labels on the stern of the PWC and explain the geographical boundaries for operation of rental PWCs. The dock boys were told to then escort the customers to the floating dock and provide instructions on how to safely operate the PWC. Specifically, Bay Runner asked its dock boys to explain to every customer that without the key in place the PWC would not operate, that customers should wear an ignition-tethered wrist band at all times, that the boat had no brakes and had a stopping distance of 300 feet, that if the throttle was not engaged the customer would be unable to steer, and that customers should not exceed 6 knots (or idle speed) in the channel exiting the marina.

Jason Dare was a dock boy employed by Bay Runner in July 1995. He was sixteen years old at the time and had been a Bay Runner employee for three years. Mr. Dare had taken the Coast Guard boating safety course and was certified by DNR as a PWC guide. When Mr. Dare turned over a PWC to a customer, he usually asked them if they had ever ridden a PWC. If the customer said they had never ridden a PWC, Mr. Dare would provide the customer with a key on a wrist band; then he probably would recite a short speech in which he pointed out the start/stop button, the kill switch, and the trigger throttle; he might explain that without maintaining the throttle, the PWC would

2. Every Bay Runner employee who testified used the terms "counter girls" and "dock boys" in their depositions and at trial to describe the individuals who worked in the rental office and on the dock. These terms have also been used in the parties' submissions to the Court. While the Court recognizes that these titles may appear pejorative, the Court nevertheless uses Bay Runner's terminology in the interest of clarity and consistency.

not turn; he probably would describe the landmarks that defined the operating course; and he would probably warn that the speed limit within 100 feet of any fixed object was 6 knots or idle speed. If the customer indicated that he already knew how to operate the PWC, Mr. Dare would simply provide him with the key on a wrist band, describe the landmarks that defined the operating course, and warn him to stay under 6 knots or idle speed in the channel. Given Mr. Dare's youth at the time of the accident and his demeanor on the witness stand five years later, the Court finds that his instructions would not have been given with energy or enthusiasm but instead probably would have been mumbled in a self-conscious, adolescent manner.

In the summer of 1995, Mr. and Mrs. Goldberg, Samantha Kempton, Kimberly Kempton, and Dana Goldberg were vacationing together in Ocean City where they received a promotional brochure from Bay Runner in their hotel room. On July 19, 1995, the five traveled to Bay Runner's rental office and spoke briefly with Mr. Wenzlaff regarding renting five PWCs. Mr. Wenzlaff explained that children under the age of sixteen could not rent PWCs. The five of them therefore decided that only Mr. and Mrs. Goldberg would rent PWCs and the girls would take turns riding as passengers.

As Mr. and Mrs. Goldberg returned to the rental counter, a woman outside the rental office began screaming hysterically. Hearing the commotion, the three girls went outside the office to wait for the Goldbergs. Mr. Wenzlaff also came out of the office, and the woman told him that her daughter had been injured as a passenger in a pontoon boat rented from Bay Runner. Mr. Wenzlaff became involved in a loud altercation with the woman; and he ran back into the office, grabbed his camera, and took a picture of the woman's daughter.

During the course of this altercation outside, a counter girl in the rental office asked Mr. and Mrs. Goldberg each to read and sign rental agreements. The counter girl did not provide the Goldbergs with any further instruction. Neither Mr. nor Mrs. Goldberg read the rental agreement or the DNR regulations appearing on the back of the agreement or on the poster in the rental office.

After signing the rental agreement, the Goldbergs and the three girls walked down to the dock to wait for a dock boy to provide them with the two PWCs. After waiting for a short time, Mrs. Goldberg changed her mind about renting a PWC, and Mr. Goldberg returned her contract to the rental office for a full refund. Mr. Goldberg returned to the dock where he and the others waited for an additional period of time. While they waited, neither Mr. nor Mrs. Goldberg read the DNR regulations posted on a plywood board at the dock.

When it became Mr. Goldberg's turn to receive a PWC, he was met by Jason Dare. Mr. Dare asked Mr. Goldberg if he had ridden a PWC before, and Mr. Goldberg responded that he had. (Several years previously, Mr. Goldberg had operated a PWC in Aruba for a short time.) Mr. Dare then handed him a key on a wrist band, described the landmarks that defined the operating course, and warned him to stay under 6 knots or idle speed in the channel. The PWC was already in the water when Mr. Goldberg received it. Mr. Dare did not ask Mr. Goldberg to read the warning labels on the stern of the PWC, and they were illegible from a standing position on the dock.

The proof in this case persuades the Court that in light of Mr. Goldberg's indication to Mr. Dare that he had previously operated a PWC, Mr. Dare probably did not mention the steering characteristics of the PWC. The preponderance of the evidence, including the very youthful and uninspiring demeanor of Mr. Dare combined with Bay Runner's overall lack of safety and customer training procedures, causes the Court to conclude that Mr. Goldberg

was not specifically warned about the PWC's steering characteristics.

After finishing with Mr. Dare, Mr. Goldberg took his daughter Dana out via the channel. Although required to wear glasses for driving, Mr. Goldberg did not wear his glasses while operating the PWC and did not notice any of the speed limit postings along the channel or in the bay. Mr. Goldberg understood that children under sixteen were not permitted to operate the PWC, but he nevertheless stopped the PWC, dismounted, and allowed his daughter to operate the PWC for several minutes. They then switched back to their original positions and returned to the dock. Dana Goldberg got off the PWC, and Kimberly Kempton boarded the PWC with Mr. Goldberg and they headed down the channel and into the open bay. Kimberly Kempton also drove the PWC for several minutes in the open bay, and then the two of them switched back to their original positions and returned to the dock. Samantha Kempton then boarded the PWC with Mr. Goldberg, and the two of them went down the channel and out into the open bay. Like her sister, Ms. Kempton operated the PWC for several minutes, and then Mr. Goldberg took control once more.

Approximately one hour after Mr. Goldberg rented the PWC and while traveling at about 15 to 20 knots, he returned from the bay to the channel for the final time. Because he was entering the channel from the bay at an angle, for some period his vessel was pointed at the bulkhead that runs along the side of the channel. When Mr. Goldberg realized that he might collide with the bulkhead, he took his hand off the throttle and attempted to steer the PWC away from the bulkhead. Without the throttle engaged, the PWC had no steering capability and it did not turn. Mr. Goldberg collided with the bulkhead, and he and Ms. Kempton were thrown from the PWC. Ms. Kempton sustained serious injuries as a result of the accident. Her mother suffered emotional trauma. After the accident, Mr. Goldberg stated on several occasions that he believed that the PWC's steering had malfunctioned.

## IV. Analysis

As discussed in the Court's November 24, 1999 order, the only issues to be decided in this separate trial are: 1) what acts of negligence on the part of Bay Runner, if any, caused the accident and 2) whether Bay Runner's managerial employees had knowledge of the relevant acts or omissions (if any) that caused the accident (Paper No. 99). In the pretrial order, Claimants indicated that the only theory they intended to rely upon as a defense to Bay Runner's limitation of liability claim is that "Bay Runner's managerial employees knew or should have known that [Bay Runner] did not provide adequate instruction concerning the proper use of the personal watercraft to Steven Goldberg or the Claimants" (Paper No. 117).

This matter is within the admiralty jurisdiction of this Court pursuant to 28 U.S.C.A. § 1333 (1993). Accordingly, this case is to be decided under the substantive federal admiralty law. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 214–18, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). In *East River*, the Supreme Court described federal maritime law as "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." 476 U.S. at 864, 106 S.Ct. 2295. In this case, Bay Runner and Arctic Cat submitted a joint memorandum identifying the law they believe governs this case. Finding the Bay Runner/Arctic Cat submission to be consistent with its understanding of applicable law in this specialized area, the Court directed Claimants to respond to this memorandum and instructed them that to the extent that they did not note an objection, they would be deemed to have acquiesced to the application of the law as set out therein.

Claimants submitted a short, responsive memorandum, citing different cases than Bay Runner and Arctic Cat but essentially agreeing with the overall structure of the applicable law.

### A. What acts of negligence (if any) caused the accident.

As discussed above, Claimants allege that Bay Runner failed to provide adequate instruction concerning the proper use of the PWC to Mr. Goldberg or the Claimants. Federal maritime law has absorbed most common-law negligence theories, including the failure to warn of dangerous conditions. *See* 8 Benedict on Admiralty § 4.03; *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 334 (5th Cir. 1997) (allowing Jones Act plaintiff to recover where employer negligently failed to properly train him in the operation of ship's winch). The parties agree that an allegation of failure to provide adequate instruction is a subset of this general allegation of failure to warn. Restatement 2d Torts § 388. Therefore, in order to establish Bay Runner's negligence, Claimants must prove that

1. the product possesses a danger that is not obvious to the anticipated users,
2. Bay Runner had reason to know that the product had a danger that was not obvious to the anticipated users, and
3. Bay Runner failed to give an adequate warning of that danger to the user.

*Id.*

The Court finds that the inability to steer the PWC when the throttle is not engaged is an operating characteristic that is inconsistent with that of most vehicles that a novice PWC renter/user could reasonably be expected to have previously operated. Bay Runner's expert, Dr. Goldhaber, testified that an operator must know that if he takes his hand off the throttle, he will not be able to steer, that such information was "critically important safety information," and that a new user could not be expected to know this infor-mation before boarding a PWC. The Court therefore concludes that the lack of off-throttle steering was a dangerous condition that was not obvious to anticipated users.

The Court next finds that both Mr. and Mrs. Wenzlaff had reason to know of the danger associated with the lack of off-throttle steering and their concomitant duty to warn their customers of this danger. Both Mr. and Mrs. Wenzlaff recalled that the lack of off-throttle steering was identified in the operator's manual and "Play It Safe" video provided to Bay Runner by Arctic Cat. At trial, Mrs. Wenzlaff testified that she had a high duty of care to ensure that novice riders received information regarding a PWC's operating characteristics. Mr. Wenzlaff admitted that engaging the throttle in an emergency situation was "counter-intuitive" and that knowledge of off-throttle steering was "critically important information" to provide to customers.

Finally, the Court finds that Bay Runner failed to give Mr. Goldberg or the Claimants adequate instruction regarding the lack of off-throttle steering. As noted above, the Court finds by the preponderance of the evidence that Mr. Goldberg was never warned that if he released the throttle, he would lose the ability to steer the PWC.

Bay Runner points out that even if Mr. Goldberg were not warned specifically about the lack of off-throttle steering, Mr. Goldberg was warned that the PWC had no brakes, that the stopping distance from full speed was approximately 260 feet, and that he must not exceed 6 knots or idle speed within 100 feet of any fixed object. They argue that the law does not require an encyclopedic warning and that these general warnings were sufficient even without specifically explaining the lack of off-throttle steering. *See Hood v. Ryobi America Corp.*, 181 F.3d 608, 610–11 (4th Cir.1999). The Court recognizes that a livery does not need to warn its customers

of every mishap or source of injury that the mind could imagine flowing from the product. *See id.* The loss of steering capability when the throttle was not engaged, however, was not a mishap or source of injury flowing from operating the PWC at an excessive rate of speed near a fixed object. It was a different kind of danger or risk that required a separate warning. Individuals who are properly instructed regarding the steering characteristics of a PWC can avoid collisions in a qualitatively different manner than individuals who are merely warned to reduce their speed near fixed objects (i.e., they can engage the throttle and steer away from obstacles to avoid collisions in addition to simply slowing down to avoid collisions). The Court therefore finds that the general warnings Bay Runner provided regarding speed did not relieve them of the obligation to instruct their customers regarding the lack of off-throttle steering on their PWCs.

The Court also notes that Bay Runner has a duty to warn customers of dangers associated not only with the use of a product but also the dangers associated with the reasonably foreseeable misuse of a product. In *Moran v. Faberge, Inc.,* 273 Md. 538, 332 A.2d 11 (1975), the Maryland Court of Appeals observed:

> As it pertains to this case the key language of [Restatement 2d Torts] Section 388 is that which instructs that a manufacturer is liable for harm 'caused by the use of the chattel in the manner for which ... it is supplied.' Strictly speaking these words would lead one to believe that the manufacturer's responsibility extends only to those intended uses for which the product was supplied. However, this is misleading since such is not the case. As most courts and legal authors agree, the duty of the manufacturer to warn of latent dangers inherent in its product goes beyond the precise use contemplated by the producer and extends to all those which are reasonably foreseeable.

*Id.* at 15–16. In this case, it was foreseeable that Bay Runner's customers would operate the PWCs in excess of 6 knots while in the channel—especially when entering the channel from the open bay where a PWC's speed is not similarly limited.

## B. Proximate Cause.

■ Bay Runner argues that even if it was negligent in failing to provide adequate instruction to Mr. Goldberg, its negligence was not the proximate cause of the accident. Bay Runner asserts that Mr. Goldberg's negligence was the superceding proximate cause of the crash. The Supreme Court has recently held that the doctrine of superceding cause applies in admiralty:

> The doctrine of superceding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. It is properly applied in admiralty cases.

*Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996). When ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, "courts sitting in admiralty may draw guidance from, *inter alia,* the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources." *Id.* at 839, 116 S.Ct. 1813.

In this case, Bay Runner points out that Mr. Goldberg operated the PWC for approximately one hour before the accident, stopped the PWC at least six times in the open bay, and docked the PWC twice to change passengers. Bay Runner concludes that as a result of performing these maneuvers, Mr. Goldberg became independently aware of the operating characteristics of the PWC sometime prior to the accident but nevertheless failed to exercise

due care, thereby making his negligence the superceding proximate cause of the accident.[3] The Court points out, however, that none of these maneuvers performed by Mr. Goldberg prior to the accident necessarily required him to turn the PWC while the throttle was disengaged. In particular, Bay Runner presented no evidence that Mr. Goldberg would have any reason to release the throttle and attempt to turn while traveling with any significant speed prior to the accident. The Court further notes that even after the accident, Mr. Goldberg did not understand the lack of off-throttle steering. He stated several times after the accident that he believed that his inability to steer was the result of the PWC malfunctioning. The Court therefore finds that Mr. Goldberg did not become independently aware that when the throttle disengaged, he could not steer the PWC.[4]

Bay Runner also argues that Mr. Goldberg was traveling at an excessive rate of speed, was not wearing his glasses, and was not paying attention to what was in front of him. Bay Runner suggested in closing arguments that if Mr. Goldberg had been traveling at a safe speed, had been wearing his glasses, and had been keeping a proper lookout, this accident would not have occurred. The Court recognizes that negligent acts by parties other than Bay Runner may have contributed to this accident. In this opinion, the Court does not make any findings regarding what other factors may have contributed to this accident. The Court finds, however, that even if Mr. Goldberg was on a collision course with the bulkhead as a result of his own excessive speed, failure to wear prescribed glasses, and failure to pay attention, he nonetheless would have been equipped to avoid the accident if he had been instructed regarding the steering characteristics of the PWC. If properly instructed and warned, he would have known he must engage the throttle to effectively steer away from the bulkhead and/or that he must not carry so much speed into the channel as to necessitate closing the throttle once there for to do so would be to forfeit all steering. The Court therefore concludes that Bay Runner's negligence was a proximate cause of the accident.

## C. Whether Bay Runner managers had knowledge of the events that caused the accident.

■ Once Claimants have met their burden of proving negligence, then Bay Runner must prove the negative proposition of the absence or lack of its privity or knowledge: "A shipowner seeking limitation of liability bears the burden of proving that he was without knowledge of the condition or negligence responsible for the collision." *In re Hellenic Lines,* 813 F.2d 634, 638 (4th Cir.1987) (citing *Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943)). The Court finds that Bay Runner (to include its owners and managers) was in privity with the failure to provide adequate instruction concerning the proper use of the PWC to Mr. Goldberg.

---

**3.** Claimants have not named Mr. Goldberg as a defendant in the underlying tort suit. *See* 2 Benedict on Admiralty § 2 ("A plaintiff injured by two or more joint tortfeasors may sue one or both of them, and their liability to the plaintiff will be joint and several."). The Court notes, however, that both Bay Runner and Arctic Cat have filed claims for indemnity against Mr. Goldberg in the present limitation of liability action (Paper Nos. 12 & 40). Both allege that any damages sustained by the Claimants were caused or contributed to by Mr. Goldberg's negligence. *Id.* Both have obtained a clerk's entry of default against Mr.

Goldberg (Paper Nos. 65 & 67). If these entries of default are reduced to default judgments, presumably Bay Runner and Arctic Cat could enforce these judgments against Mr. Goldberg for any amount they paid to Claimants.

**4.** Mr. Goldberg's prior experience operating a PWC in Aruba many years before the accident was too remote in time and too brief to serve as an independent source of instruction or warning vis-a-vis this accident.

In the case of a corporation such as Bay Runner, the Supreme Court has stated that "the privity or knowledge must be that of the managing officers of the corporation." *Craig v. Continental Ins. Co.,* 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886 (1891). A managing officer, however, is "not necessarily one of the head executive officers, but is anyone to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business." *Id.* In this case, both Mr. and Mrs. Wenzlaff were managerial employees. On the other hand, the dock boys, and Mr. Dare in particular, had none of the attributes of managerial employees. The only possible discretion they may have had (and it was never suggested that this discretion was exercised) was to find a manager if they felt a customer was unfit to rent a PWC. This minimal amount of discretion is no indication of managerial status.[5]

The Court finds that Mr. and Mrs. Wenzlaff were in privity with the failure to provide adequate instruction to Mr. Goldberg. The words 'privity or knowledge' as used in the statute are not limited to personal participation of managerial employees in the fault but encompass "some personal knowledge or means of knowledge, of which [a managerial employee] is bound to avail himself of a contemplated loss, or a condition of things likely to produce or contribute to the loss, without adopting appropriate means to prevent it." 3 Benedict on Admiralty § 41 (quoting *Lord v. Goodall, Nelson & Perkins S.S. Co.,* 15 F. Cas. 884, 887 (C.C.D.Cal.1877)). The Fourth Circuit has stated that "[t]he shipowner is chargeable with knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence." *Empresa,* 730 F.2d at 155. Although Mr. and Mrs.

Wenzlaff may not have known that Mr. Dare failed to instruct Mr. Goldberg on this occasion, Bay Runner's program for instructing its customers was deficient, and Mr. and Mrs. Wenzlaff should reasonably have known that certain customers were likely to receive a PWC without receiving adequate instruction.

Bay Runner's customers received no written or videotaped warning regarding the lack of off-throttle steering. Instead, Bay Runner relied exclusively on a laconic sixteen-year-old dock boy to orally convey to Bay Runner's customers the "critically important safety information" related to the lack of off-throttle steering. For each and every customer, Bay Runner expected Mr. Dare to remember to discuss the DNR regulations, the course boundaries, the rules of the road, the lack of off-throttle steering, and the use of the emergency kill switch. Mr. Dare had no check list to ensure that he had given complete information to each customer. Under a system such as this, it was very likely that Mr. Dare would fail to give some customers complete and adequate instruction. For example, Mr. Dare may have been tempted to abbreviate the instructions on busy days such as the day of the accident or may have been distracted by some commotion such as a woman screaming about an injured child.

For these reasons, the Court finds that Bay Runner failed to prove that it was without privity or knowledge of the negligent acts that caused the accident. The Court therefore holds that Bay Runner has failed in its Limitation of Liability Act claim.

## V. Remaining Issues

On October 29, 1999, the Court directed the parties to address the issues of wheth-

---

5. Prior to this matter being referred to the undersigned, the Court addressed this same issue in its September 14, 1998, memorandum (Paper No. 69) when it stated: "Bay Runner argues, and Claimants do not contest, that the 'dock boy' who helped Steven Goldberg and Samantha Kempton to get on the jet ski was a ministerial employee. Any knowledge he had about the alleged failure to instruct Steven Goldberg cannot be imputed to Bay Runner."

er Claimants waived their right to a jury trial, whether they could voluntarily dismiss their counter-claims in the instant limitation of liability action, and whether they were entitled to additional discovery (Paper No. 92). The Court deferred a ruling on these issues pending completion of the separate trial on Bay Runner's limitation of liability action. Having denied Bay Runner's claim for limitation of liability, the Court now turns to these remaining issues.

■ In *Wheeler v. Marine Navigation Sulphur Carriers, Inc.*, 764 F.2d 1008 (4th Cir.1985), the Fourth Circuit held that once a district court has denied limitation of liability, no reason remains to deprive claimants of their choice of forum or of their right to a jury trial. *Id.* at 1011. The Court noted a consensus among the circuits that "once limitation is denied, plaintiffs should be permitted to elect whether to remain in the limitation proceeding or to revive their original claims in their original fora." *Id.* The Court stated that "any order denying the owner's right to limitation should contain provisions for lifting the restraining order." *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 451 (4th Cir.1999)(quoting *In re Wood*, 230 F.2d 197, 199 (2d Cir.1956)). In an order accompanying this memorandum opinion, the Court is dissolving the stay on the underlying tort actions.

Claimants now have two options. First, they may continue to litigate their claims in the instant limitation proceeding before the undersigned. Under this scenario, Claimants would not be entitled to a trial by jury, and Bay Runner, Arctic Cat, and Claimants would all present their remaining claims in a trial to this Court sitting in admiralty.

Second, Claimants could abandon their claims in the instant limitation of liability action and pursue them in the underlying tort suit presently assigned to Judge William M. Nickerson, *Kempton, et al. v. Bay Runner Rentals, et al.*, WMN–97–2350. The Court notes that essentially the same substantive federal maritime law would apply in the underlying tort suit as in the limitation proceeding. *See* 8 Benedict on Admiralty § 5.01(A) ("If a pleasure craft case is cognizable in admiralty, the substantive general maritime law will govern in both federal and state Court, unless there is no applicable maritime rule, in which case the Court may adopt state law."). If Claimants chose to pursue their claims before Judge Nickerson in the Court of law, however, they would retain whatever jury trial rights they had before Bay Runner initiated the instant limitation of liability action.

The Court recognizes that even if Claimants abandon their claims in the instant limitation of liability action, Arctic Cat, as a claimant in the limitation of liability action, also has the option of continuing to pursue its claims in a trial to this Court sitting in admiralty. Because Bay Runner's limitation of liability action has been denied and the stay on related actions has been lifted, however, the Court notes that Arctic Cat is not entitled to any special preference with regard to the order in which its claims are tried vis-a-vis the underlying tort suit. (Logically, Arctic Cat's claim against Bay Runner should be resolved only *if* and *after* it is determined whether Arctic Cat has any liability to the Claimants.)

Claimants argue that they have not had the opportunity to conduct sufficient discovery to prosecute their claims against Arctic Cat. The Court continues to defer any ruling on whether Claimants are entitled to additional discovery until after it is clear in which case Claimants will try their claims. Once Claimants have made their choice regarding the future course of this litigation, the Court will hold a conference to schedule necessary additional proceedings.

In addition to these procedural questions, significant substantive questions remain open in this litigation. The Court has not addressed, among other things, 1)

whether any negligent conduct by Arctic Cat or Steven Goldberg was also a contributing cause of the accident, 2) the extent of any damages Claimants incurred as a result of this accident, and 3) whether Bay Runner and Arctic Cat are entitled to default judgment against Steven Goldberg on their claims for contribution and indemnity.

It is therefore:

ORDERED that Bay Runner's Complaint seeking exoneration from liability, civil or maritime, or limitation thereof, (Paper No. 1) is DENIED.

IT IS FURTHER ORDERED that the order staying "all suits, actions, or legal proceedings of any manner or description whatsoever against the petitioner in respect to any claims arising out of or connected with the allision described in [Bay Runner's] verified complaint" (Paper No. 5) is now DISSOLVED.

IT IS FURTHER ORDERED that on or before September 28, 2000, Claimants shall inform the Court whether they elect to further prosecute their counterclaims and cross-claims in the instant limitation proceeding or to revive their original claims in the underlying tort suit assigned to Judge Nickerson.

IT IS FURTHER ORDERED that Third–Party Defendant Arctic Cat, Inc.'s Motion for Summary Judgment Against Third–Party Complaint of Samantha Kempton and Joan Goldberg (Paper No. 123) is DENIED WITHOUT PREJUDICE. Arctic Cat may refile the motion in whichever case Claimants choose to pursue their claims.

IT IS FURTHER ORDERED that on October 2, 2000 at 3:00 p.m., Bay Runner shall initiate a telephone conference among all parties and the Court in order to 1) schedule a hearing regarding whether Bay Runner and Arctic Cat are entitled to default judgment against Mr. Goldberg and

2) schedule any remaining litigation before the undersigned.